

JEFFREY W. DEPRIEST

VERSUS

RIVER WEST, ET AL.

CIVIL ACTION NO. 03-1058

JUDGE: A

MAGISTRATE-JUDGE: M1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

### FACTS:

Plaintiff, Mr. DePriest, is a Registered Radiologic Technologist (RT) who performed X-Rays, CT Scans, arteriograms, angiograms, venograms, and MRI's. He is licensed by the State of Louisiana and holds his national certification - AART.[1] He is the father of small children, but is now divorced. On December 3, 2001, Mr. DePriest responded to an ad placed by defendant seeking employment as Imaging Director.[2] After being interviewed, he was hired for the job of Imaging Director at River West Medical Center in Plaquemine, Louisiana.[3] As Imaging Director, Mr. DePriest's job duties included supervising approximately nine (9) technologists, as well as staffing the Radiology Department, ensuring compliance, and general supervision of the Department. He reported directly to Doug Arbour, the Director of Ancillary Services at River West.[4] At hire, he was paid

---

[1]DePriest deposition, A, pp. 9-19, 30

[2]DePriest deposition, A, pp. 31-33

[3]DePriest deposition, A, p. 33-36

[4]DePriest deposition, A, pp. 50-58

1

$58,000.00/year which amounted to $27.88/hour for 40 hours/week. His initial compensation was in the form of a salary as the Imaging Director.[5] At the time Mr. DePriest served as Imaging Director, there was a "staffing shortage" in his Department.[6]

On June 12, 2002, Mr. DePriest submitted his resignation from the position of Imaging Director to the defendant. Mr. DePriest intended to leave his employment at River West to take a "work on weekends" technologist position at OLOL and to attend school.[7] In his 30-day resignation letter, Mr. DePriest advised defendant he would like to remain as a "PRN" or "as needed" technologist.

Following his resignation as Imaging Director, Mr. DePriest and Arbour discussed Mr. DePriest remaining in defendant's employ as a weekend technologist if defendant could match the hourly compensation offered to him by OLOL.[8] In that discussion, Arbour made it abundantly plain to Mr. DePriest that he could have the weekend position but that Mr. DePriest would be required to stay the entire weekend in the hospital:

A.    He did mention that I would have to take the call in between the two 16-hour shifts that I work, one before and one in between, and I would have to stay there in the hospital. He said, '**I think it would be a deal breaker if we couldn't do that.**'
                                   \* \* \*

A.    He [referring to Arbour] asked me if I was going to take the call, and I said, 'Yes, I'll take the call.' And he said, '**You would stay here in the hospital and take the call,**' and I said, 'Yes, I would.' He said, '**If you didn't, that would be a deal**

---

[5]DePriest deposition, A, pp. 60-62

[6]DePriest deposition, A, pp. 62, 65-66

[7]DePriest deposition, A, pp. 66-69, Exhibit JD-13

[8]DePriest deposition, A, pp. 69-71

2

breaker. We wouldn't be able to do that.'[9]

When Mr. DePriest began his duties as weekend technologist, he was required, by his boss, to remain

at all times at River West. He could not leave at any time. Mr. DePriest testified, regarding his work

hours on the weekend:

> A.    First, when I first started, I worked an eight-hour shift on Friday, three to eleven.
> Q.    I'm sorry. I'm going to stop you there. When you say you first started, started what?
> A.    The weekend position there at River West.
> Q.    Okay. Go ahead.
> A.    I worked an eight-hour shift, three to eleven [Friday], take call from 11 p.m. to 7 a.m., work a 16-hour shift, 7 a.m. to -
> Q.    11 p.m. [Saturday]
> A.    -11 p.m., eight hours call and then another 16-hour shift [Sunday].[10]

While Mr. DePriest had been the Director of Imaging, River West staffed the Radiology Department

with two (2) weekend technologists, who rotated weekends. When Mr. DePriest took the weekend

technologist position, he was the ONLY one:

> Q.    So although there were two weekend technologists before you took that position, when you took the position, you were the only one?
> A.    Correct.[11]

Mr. DePriest assumed the job of two (2) technologists. As a condition of the job, Mr. DePriest

arrived for work (originally at 3 p.m. on Friday and later in his tenure at 11 p.m. on Friday) and was

required to remain at the hospital the entire time from Friday p.m. until 11 p.m. on Sunday.[12] He was

not allowed to leave the hospital premises for any reason, nor was he provided a beeper or a cell

---

[9]DePriest deposition, A, pp. 71-72 (emphasis added)

[10]DePriest deposition, A, pp. 72-73

[11]DePriest deposition, A, p. 77

[12]DePriest deposition, A, pp. 104-105; 185-187

3

phone, and the only mechanism to contact him was via a telephone in the ultrasound room where he

slept:

> Q. But Doug said that you would have to - when you were taking call, that you would have to remain in the hospital?
>
> A. Yes.
>
> Q. You sure he said that?
>
> A. Yes.[13]
>
> &#42; &#42; &#42;
>
> Q. Let's talk about those periods of time Friday night 11 p.m. to Saturday 7 a.m. and then again Saturday at 11 p.m. to Sunday at 7 a.m. Each of those are eight-hour periods?
>
> A. Correct.
>
> Q. And tell me, during those two periods every weekend, what is it that you were required to do.
>
> A. **I was required to be there at the facility and to perform any radiology exams that I was capable of performing.**
>
> Q. CAT scans or -
>
> A. X-rays.
>
> &#42; &#42; &#42;
>
> Q. These would be, I presume, emergencies, CAT scans and emergency X-rays?
>
> A. Probably the bulk of it, yes.[14]
>
> &#42; &#42; &#42;
>
> A. I couldn't leave the facility
>
> Q. Who was it that told you you couldn't leave the facility?
>
> A. Doug.[15]
>
> &#42; &#42; &#42;
>
> Q. Right. And you weren't permitted to go into town or to do anything else you wanted away from the hospital?
>
> A. No. My understanding is that I had to remain there for any emergency room patients that came in.
>
> Q. Remain physically in the hospital?
>
> A. Correct.
>
> Q. And that you couldn't even go outside of the hospital and go into town, into Plaquemine?

---

[13]DePriest deposition, A, p. 78

[14]DePriest deposition, A, p. 105

[15]DePriest deposition, A, p. 107

4

A.   Correct.[16]

                              * * *

Q.   The room that you were talking about that you slept in, the ultrasound room, you mentioned there was a bathroom in there?

A.   Yes.

Q.   Was there a shower in the bathroom?

A.   No.

                              * * *

Q.   . . . Back out to the ultrasound room, was there a telephone in that room?

A.   Yes.

Q.   That's the number that they - That's the phone that they would call you on if there was a call?

A.   Yes.

Q.   While you were on call during these two eight-hour periods on the weekends, you couldn't have gone home or gone somewhere else if you wanted away from the hospital?

A.   I was told that I needed to stay there at the facility in case there was calls.

Q.   That was the conversation with Doug before you took that position?

A.   Yes.

Q.   Now, when you came to work on Fridays to work the weekends, did you bring anything with you?

A.   Yes. . . change of clothes, . . . several meals. . . an ice chest with some drinks. . . [17]

                              * * *

Q.   . . . at River West, you were not allowed to go?

A.   Correct.[18]

                              * * *

Q.   When you got there [River West] as the supervisor or director of this department, was it your understanding that Michael and this woman on their rotating weekends would report to work at 3 p.m. on Friday and not leave until 11 p.m. on Sunday?

A.   No.  They would report at 11 [on Friday].

                              * * *

Q.   When you arrived and became director of the department, was it your understanding that Michael and this woman were required to stay over the entire weekend at the hospital?

A.   Yes.

Q.   Were there ever any other personnel affiliated with River West, other than what you told me Mr. Arbour said, who stressed to you or told you that it was important or

_____

[16]DePriest deposition, A, p. 108

[17]DePriest deposition, A, pp. 127-128

[18]DePriest deposition, A, p. 184

5

|     | necessary for the radiology department to be covered the entire time? |
| --- | --- |
| A. | Dr. Scherer. |
| Q. | What did he tell you? |
| A. | We was discussing - or putting someone on call for 11 to 7, and he said it wouldn't be a good idea. They tried in once, and it didn't work. I think the ER director wouldn't agree with it or agree to it. I wouldn't be prudent. I wouldn't be time efficient. |
| Q. | When you are saying you and he discussed putting someone on call from 11 p.m. to 7 a.m., you meant that they wouldn't be at the hospital, they would just have a beeper? |
| A. | Right. |
| Q. | While you worked at River West, you didn't have a beeper that the hospital provided? . . . And I'll put it on the weekend RT position? |
| A. | **No, I didn't**.[19] |

* * *

|     |     |
| --- | --- |
| Q. | [Referring to the written agreement] 'River West Medical Center and the employee' - That's you, the employee - 'have come to an agreement regarding payment terms and schedules to provide coverage in the radiology department on weekends and other various shifts to provide a flexible staffing alternative for the radiology department staff members and **consistent coverage**.' You see that part? |
| A. | Uh-huh. |
| Q. | Do you have any idea what the flexible staffing alternative was? |
| A. | I'm assuming that it was me working weekends. |
| Q. | All weekend? |
| A. | Yes. |
| Q. | That jives with this statement here, 'consistent coverage?' |
| A. | Correct. |
| Q. | Did you have an understanding of the phrase 'consistent coverage' to include that somebody had to be in radiology the entire time? |
| A. | Yes.[20] |

In fact, not only was the "you must remain in the hospital from Friday until Sunday night" procedure in place before Mr. DePriest became director of the department, and was certainly imposed on him when he became the weekend technologist. He testified that there was never an occasion when he was not awoken from sleep and called to do work, in other words, he never enjoyed an

---

[19]DePriest deposition, A, pp. 189-190 (emphasis added)

[20]DePriest deposition, A, pp. 191-193 (emphasis added) and citation to JD-14 which is attached as Exhibit B

6

uninterrupted night's worth of sleep.[21] The work he did, whether characterized as "on call" as opposed to his 16-hour shifts on Saturday and Sunday, was identical. Reflected in the call back logs[22] are indicia of the procedures performed by Mr. DePriest during the "on call" time - he was clearly not sleeping. There is no instance on any of the logs where Mr. DePriest was not called to duty during the alleged "sleeping time." In addition, Mr. DePriest testified (directly contrary to the defendant's Affidavits) that the times reflected on the logs (which he filled out) were mere estimations of the actual scan time. The times do not reflect the actual amount of time it took to retrieve the patient (which he did by himself from whatever location in the hospital), wheel the patient to Radiology, set the patient up on the table, inject the contrast and allow it to flow throughout the body, if ordered, run the scan, remove the contrast, remove the patient, and return the patient (by himself) to the appropriate location in the hospital. Mr. DePriest testified that the logs were used solely for the purpose of logging what type of scan or X-ray was performed to determine being paid either the $15/ X-ray procedure or the $45/CT scan procedure.

In addition, every Friday Mr. DePriest arrived to work, he would first report to the ER, provide his number in the ultrasound room, where he slept, and await the calls - which occurred every night he worked. River West is the only hospital in the entire area and the only facility which has a 24-hour emergency room. River West was also the only facility of which Mr. DePriest was aware that did not compensate its RT's. The industry standard was far different than that practiced at River West.[23]

---

[21]DePriest deposition, A, pp. 197-211; 216-220

[22]Exhibit C, Call Back logs, in globo

[23]DePriest deposition, pp. 159-163

7

In short, Mr. DePriest did not, as alleged by the defendant, have unfettered "sleeping" or "activity" time while he worked for the defendant. The so-called "on call" hours literally threw him into overtime (in excess of 40 hours) virtually every week he worked as the weekend RT. He calculates his unpaid wages and overtime compensation as $12,449.93. The amount, as he testified was arrived at by taking his full hours as reflected on his pay stubs during this time[24], deriving the hours worked from each as reflected on the pay stub, applying either his regular hourly rate of $22.87/hour (if not an overtime hour) or his overtime hourly rate of $34.31/hour, less any amounts paid for "on call time" at $2.00/hour and less every per procedure payment ($15/X-ray or $45/CT scan).[25] Attached to his Affidavit is a summary of all of his pay stubs reflecting the unpaid wages and overtime wages calculations for the Court's convenience.[26] Mr. DePriest was not paid his regular hourly rate for 452.5 hours and was not paid his overtime rate for 207.25 hours - total hours of 659.75.

Mr. DePriest's testimony regarding his working conditions was fully buttressed by Dr. Carl Scherer, the Staff Radiologist/Medical Director of the Radiology Department. In his deposition, Dr. Scherer testified:

> Q.    Did you ever have any discussions with Mr. DePriest about staffing the radiology department 24/7?
> A.    That's a pretty ambitious question. I don't know what you, 'as far as staffing', what do you mean?
> Q.    Making sure that there was an RT in the radiology department at all times.
> BY MR. LANDRY:   Objection to form. When you say 'in the department', you mean physically present?

---

[24]Exhibit D, Mr. DePriest's pay stubs, in globo (JD-22 to DePriest's deposition)

[25]DePriest deposition, A, pp. 211-215

[26]DePriest Affidavit, with attachment, Exhibit H

8

BY MS. CRAFT:     Yeah.

A.     [by Dr. Scherer] I don't remember any specific conversations as far as what you're referring to. Now, I had conversations at all times with directors of the departments, as far as making sure the departments are covered, as far as technologists and what have you. **So there may have been a conversation that could have encompassed that...**

\* \* \*

A.     **... We always had to have a tech that was available to able to be called to be able to do whatever studies needed to be done... What you're saying it's a kind of specific question from that standpoint. Is there a need for a technologist to be available twenty-four and seven? Yes, there is... I mean, as long as they are in the hospital and available is basically what it amounts to.** And that is for plain films. Other modalities, ultrasound, nuclear medicine, CT doesn't recall (sic) a technologist be in-house.

Q.     So when you're talking about always had to have a technologist and RT available 24/7, as long as they were in the hospital, that's okay?

A.     That was my understanding, yes. That basically was - well, let's put it this way... Previous administrators had a policy or tried to implement a policy where the technologist on call for plain films was NOT in-house but was actually at home. And that was called out... That's the policy I prefer, but it hasn't always been the policy.

\* \* \*

Q.     The prior policy was to have RT's on call being out of the hospital and being called in if they had to do plain films. That's how I understand it. And then that changed before Mr. DePriest got here to we need to have tech in the hospital 24/7 for plain films?

\* \* \*

A.     ... What I can say is that my experience is there has ALWAYS BEEN A TECHNOLOGIST IN-HOUSE AVAILABLE TO DO PLAIN FILMS. Other call techs were available to be called in for ultrasounds, other modalities, what have you. That was the policy when I came here. The administrator came in and tried to change it. And for whatever length of time - I can't testify to how long it was - attempted to have the RT or the technologist take the call from home, and they came out. **Then that was changed back to the way it was before.** The whole purpose in me even saying that is that I didn't want it to come across as this has always been the policy. It hasn't... When Jeff [DePriest] came on to my understanding was that there was a technologist available after-hours in-house.

Q.     And just so we're clear, 'available' means as long as they are in the hospital?

A.     That's my understanding, yes.[27]

As shown by the testimony of both Mr. DePriest and Dr. Scherer, Mr. DePriest was REQUIRED to

---

[27]Dr. Scherer deposition, E, pp. 9-13 (emphasis added)

9

be at the hospital, not free to leave at any time, the entire time period from Friday p.m. all the way through Sunday p.m. The River West Human Resources Director, Shelly Stafford, testified in her deposition that as of June 4, 2004 - immediately prior to Mr. DePriest leaving employment - the "on call" policy was changed and now defines "on call" as "being able to be back to the facility and available within 30 minutes." Now, employees are paid $2.00/hour for carrying a beeper (which was never provided to Mr. DePriest) and paid time and a half for every hour they actually work when called in.[28]

In addition, in her deposition, Ms. Stafford testified that she is not aware of any RT's ever coming in and sleeping - "No, I've never [heard] that they were sleeping here."[29] Stafford's, Scherer's, and DePriest's testimony is entirely contrary to the unsubstantiated and conclusory statements by Arbour and Prince in their Affidavits that Mr. DePriest was provided a patient room to sleep in (he was not), a shower (he was not), and the "accommodations" had an "actual cost of at least $40 per night" and were "provided to employees without charge." Interestingly, River West's own Director of Human Resources did not even know any RT's were sleeping at or had been sleeping at the hospital. Also directly contrary to his Affidavit attached to defendant's Motion for Summary Judgment, Arbour testified in his deposition:

Q.  And my question was if you didn't know about it or whatever Jeff had testified as you know that the RT's who worked weekends, the ones that rotated, the guy and the lady, they would sleep in the sleep lab as opposed to the ultrasound room, when, if ever, did you become aware of that?
A.  No, I wasn't.
Q.  Until this deposition?
A.  Yeah. That would be what he said. I wasn't aware of that.

---

[28]Stafford deposition, F, pp. 24-26

[29]Stafford deposition, F, pp. 48-49; 51-53

10

| Q. | **Did you ever offer Jeff a place to sleep at the hospital?** |
|---|---|
| A. | **No, I don't think I have.** |
| Q. | **Because you told me that you weren't aware of him sleeping at the hospital?** |
| A. | **Correct.** |
| Q. | Here's why I'm asking. I asked your lawyer to provide us with a bunch of information, interrogatories. . . . and I am just referring to Supplemental Response to Interrogatory No. 4. It's reiterated I think in three different places, but just No. 4 . . . here's my question that River West answered in Interrogatory No. 4. It said "that it" - meaning River West - "permitted the plaintiff to sleep here." And I am just trying to figure out who in River West allowed my client to do that? |

OBJECTION
* * *

| Q. | Who at River West, if you know, provided these facilities, adequate sleeping facilities, to Jeff DePriest? |
|---|---|
| A. | **I don't know.**[30] |

In fact, according to his sworn deposition testimony (which directly contradicts his Affidavit), Arbour testified that he did not even know Mr. DePriest was sleeping at the hospital until this lawsuit was filed:

| A. | . . . This whole suit is about him sleeping here and that's how I know he slept here. I never saw him actually sleeping here, no. |
|---|---|

* * *

| Q. | And when did you become aware of Jeff showing up on Friday and not leaving until Sunday? |
|---|---|
| A. | When his - when his suit came across the table, the papers and through these depositions and stuff. |

* * *

| Q. | And in his deposition, you heard him [DePriest] recount a conversation with you; are you saying that didn't happen? |
|---|---|
| A. | That is correct. That did not happen.[31] |

When questioned directly in his deposition about Mr. DePriest allegedly "choosing" to sleep at River West, as opposed to spending time with his wife and young children at home, Arbour testified that he had no first hand knowledge about that and he learned about the sleeping issue when Mr. DePriest

---

[30]Arbour deposition, G, pp. 20-25 (emphasis added)

[31]Arbour deposition, G, pp. 11-12

11

filed his lawsuit.[32] This deposition testimony is diametrically opposed to Arbour's statements in his

Affidavit filed with this Court. This is a clear, genuine issue of material fact in dispute.

Defendant argues its entitlement to summary judgment contending that a "sleeping hours"

exception applies in this case. However, clear and genuine issues of material fact exist, including

diametrically inapposite deposition testimony from defendant's own witnesses as opposed to their

"new", unsubstantiated Affidavit testimony, precluding the grant of summary judgment herein.

## LAW AND ARGUMENT:

### A. Standard for Summary Judgment

Fed.R.Civ.P. Rule 56( c) provides, in pertinent part:

> ( c) Motions and Proceedings Thereon. . . The judgment sought shall be rendered forthwith
> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with
> the affidavits, if any, show that there is no genuine issue as to any material fact and that the
> moving party is entitled to judgment as a matter of law.

The dismissal of a claim on summary judgment is proper only if it appears that Mr. DePriest can

prove no set of facts in support of the claims which would entitle him to relief. *Conley v. Gibson,*

355 U.S. 41 (1957); *O'Hare v. Global Natural Resources, Inc.*, 898 F.2d 1015 (5th Cir. 1990);

*Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.

1982), *cert. denied*, 459 U.S. 1105 (1983). Defendant River West must carry **its** burden as the

moving party to demonstrate the non-existence of any "genuine dispute as to any material fact" as

to Mr. DePriest's claims. A motion for summary judgment is no substitute for credibility

determinations to be made at the trial on the merits. As will be more fully shown herein, defendant's

motion should be denied. Serious disputes exist as to all material facts alleged by the defendant River

---

[32]Arbour deposition, G, pp. 11-12

12

West.

In the confines of an analysis under the FLSA, the inapplicability of summary judgment crystalizes more clearly. In 1944, the Supreme Court decided two (2) companion cases: *Armour & Co. v. Wantock*, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944), and *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). While each decision yielded differing results, the maxim delivered by the Supreme Court remains unyielding. No single test exists which can conclusively determine the applicability of the FLSA because "whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case." *Wantock*, 65 S.Ct. at 168. In *Skidmore*, the Supreme Court opined: "[W]e have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time. Whether in a concrete case such time falls within or without the [FLSA] is a question of fact to be resolved by appropriate findings of the trial court." *Skidmore*, 65 S.Ct. at 163.

In other words, determining the applicability of the FLSA in this case is largely if not entirely a question of fact. The facts in this case are clearly disputed.

## B. The plaintiff's claims under Louisiana law

At the outset it is noted that defendant's arguments rest entirely upon the FLSA with little or no mention of plaintiff's claims for unpaid wages under Louisiana law. As alleged in the original Petition, certain of the unpaid wages were for "regular" hours falling under the agreement between the parties. Whereas, certain of the unpaid wages were for "overtime" hours subject to the FLSA.

In this case, the evidence shows that Mr. DePriest was not paid his hourly rate for 452.5 hours ($22.87/hour). In the agreement between the parties, it clearly specifies that Mr. DePriest shall be

13

paid $22.87/hour. He was not. Pursuant to La. R.S. 23:631, *et seq.*, it was the "duty" of the defendant to pay Mr. DePriest "the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month."

The provisions of La. R.S. 23:631 are clearly mandatory, with no exceptions for any "sleeping". Louisiana law, unlike the FLSA and accompanying regulations, affords no exceptions when an employee, like Mr. DePriest, is on the employer's premises. This is especially realized where, as here, Mr. DePriest was not free to leave and rarely, if ever, spent a single night without getting a call during the weekends. As no exception would be applicable and La. R.S. 23:631 is mandatory, defendant's request for summary judgment should be denied.

Even if the Court were to conclude that some sort of exception to the mandatory provisions of La. R.S. 23:631 was applicable, the Louisiana First Circuit in *Lazauskas v. Louisiana Offshore Caterers, Inc.*, No. 12586, 371 So.2d 1183 (La. App. 1st Cir. 1979), closes the door. At issue in *Lazauskas* was a determination of three (3) hours of work time in dispute. Like the defendant employer in *Lazauskas*, River West offers no competent evidence, outside of personal estimations, that Mr. DePriest's tasks during the night weekend periods took as much time as they did:

> Defendant did not offer any evidence to contradict plaintiff's testimony that he had worked 24 hours on November 17, 1977. James Fontenot, defendant's director of personnel, testified that he did not know how many hours plaintiff actually worked. However, Fontenot testified that he decided that plaintiff was only entitled to pay for 21 hours. He based this determination on his **personal estimation of the time plaintiff would have spent** attending to personal needs (hygiene, nutrition, et cetera) during a 24-hours work period. Fontenot stated that the estimate for these 'breaks' was three hours, which time was subtracted from the hours reported by plaintiff. Jack Ulery, defendant's other employee who was on the rig on November 16-17, 1977, substantiated plaintiff's claim that he was on duty for 24 hours. Ulery noted, without giving any time estimate, that plaintiff took breaks during this period, adding 'even on a regular shift, you take breaks'.

We conclude, without recounting further the testimony in the record that plaintiff proved his

14

claim for the disputed wages in this case and that the trial court erred in dismissing the suit. . . The only basis for reducing the number of hours is defendant's unsubstantiated estimate of the time taken on breaks.

*Lazauskas*, at 1184-1185 (emphasis added)

In this case, defendant offers nothing save estimations of how long certain procedures might take. These estimations do not factor in the time it took Mr. DePriest to retrieve the patient, position them on the table or start contrast, nor the time dealing with late-night emergency room conditions and patients, nor the time taken to return the patient, nor the time taken to develop the films and forward them for review to the Radiologist, nor the time to complete all paperwork. As did the Court in *Lazauskas*, this Court should reject defendant's "estimations" and "speculations". None of the witnesses appearing via Affidavit were there and none possess first hand knowledge. Mr. DePriest is entitled to his pay.

<u>C. The plaintiff's claims for unpaid overtime wages under the FLSA</u>

The Fair Labor Standards Act (FLSA) unequivocally provides at 29 U.S.C. §207:

(a)(1)   Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

In this instance, Mr. DePriest worked greater than 40 hours per week during the majority of work weeks at issue. In fact, even subtracting the per procedure payments and the $2.00/hour, he is owed $12,449.93. The only question presented by defendant on summary judgment is whether Mr. DePriest is entitled to be paid for the time he was at the hospital and actually performing his duties. Defendant contends that Mr. DePriest is not entitled to be paid because he slept during portions of

15

those 8-hour periods. Defendant's argument is flawed in light of the facts present and in light of the law.

As a starting point of the analysis regarding "sleeping" hours, the Regulations accompanying the FLSA provide, in pertinent part:

29 C.F.R. §785.20:

Under certain conditions an employee is considered to be working even though some of his time is spent in sleeping or in certain other activities.

29 C.F.R. §785.21:

An employee who is required to be on duty for less than 24 hours is working even though he is permitted to sleep or engage in other personal activities when not busy. A telephone operator, for example, who is required to be on duty for specified hours is working even though she is permitted to sleep when not busy answering calls. It makes no difference that she is furnished facilities for sleeping. Her time is given to her employer. She is required to be on duty and the time is worktime. *Central Mo. Telephone Co. v. Conwell*, 170 F.2d 641 (8th Cir. 1948); *Strand v. Garden Valley Telephone Co.*, 51 F.Supp. 898 (D. Minn. 1943); *Whitsitt v. Enid Ice & Fuel Co.*, 2 W.H. Cases 584; 6 Labor Cases para. 61,226 (W.D. Okla 1942)

29 C.F.R. §785.22:

(a)     General. Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer **and the employee can usually enjoy an uninterrupted night's sleep**. If sleeping period is of more than 8 hours, only 8 hours will be credited. **Where no express or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked**. *Armour v. Wantock, citation omitted; Skidmore v. Swift, citation omitted; General Electric Co. v. Porter*, 208 F.2d 805 (9th Cir. 1953), cert. denied, 347 U.S. 951, 975 (1954); *Bowers v. Remington Rand*, 64 F.Supp. 620 (S.D. Ill. 1946), aff'd 159 F.2d 114 (7th Cir. 1946), cert. denied 330 U.S. 843 (1947); *Bell v. Porter*, 159 F.2d 117 (7th Cir. 1946), cert. denied 330 U.S. 813 (1947); *Bridgeman v. Ford, Bacon & Davis*, 161 F.2d 962 (8th Cir. 1947); *Rokey v. Day & Zimmerman*, 157 F.2d 736 (8th Cir. 1946); *McLaughlin v. Todd & Brown, Inc.*, 7 W.H. Cases 1014; 15 Labor Cases para. 64,606 (N.D. Ind. 1948); *Campbell v. Jones & Laughlin*, 70 F.Supp. 996 (W.D. Pa. 1947).

16

(b) Interruptions of sleep. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. **If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted**. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time. *Eustice v. Federal Cartridge Corp.*, 66 F.Supp. 55 (D. Minn. 1946).

(Emphasis added)

In this case, the evidence shows that Mr. DePriest was never afforded any opportunity for any "uninterrupted" sleeping time. Indeed, there was never a weekend where Mr. DePriest was not awoken and responded (several times during the night) to a call within the hospital. The evidence shows that Mr. DePriest was awoken. The average of nearly 3 per night (2.54) can hardly be considered "rare" and the entirety of the hours must be counted as hours worked. Indeed, according to the records, Mr. DePriest was awoken 83% of his 11 p.m. - 7 a.m. component during the time he was weekend RT. Every weekend he worked, he got woken up almost every night. Many times he was awoken for numerous X-rays or CT scans. No other RT worked on the weekend except Mr. DePriest. There was no difference between what Mr. DePriest did during daylight as opposed to what he did during the night.

As a further illustration of the intent and application of the regulations, the Court's attention is directed to the Supreme Court decisions in *Armour* and *Skidmore*. In *Armour*, the Supreme Court concluded that the firemen were entitled to compensation for the time period of 5 p.m. until 8 a.m. of the following day because they were required to be at the employer's premises, even though they were not engaged in any specific work, and they were not at liberty to leave the premises, except with specific permission to do so. The Court determined this time to be "waiting time" properly characterized as "working time" for which overtime compensation was due. In *Armour*, the employer

17

provided the firemen with cooking equipment (DePriest did not have same), beds (DePriest was relegated to a gurney in the ultrasound room in the Radiology Department), radios (DePriest had none), and facilities for cards and amusements (DePriest had none in the Radiology Department). Comparing the facts at bar to those in *Armour*, which were far less restrictive, compels the denial of summary judgment herein.

In the companion *Skidmore* decision, the Supreme Court remanded by distinguishing from *Armour* two critical facts: the plaintiffs in *Skidmore* did not have to remain strictly on the employer's premises as long as they were within "hailing distance" (the plaintiffs actually lived in their private homes on the employer's compound and they could do anything they wanted with their families, entertain, and the like) and the parties had agreed that the plaintiffs would actually be compensated for the time worked when called. Where, as here, Mr. DePriest was never free to leave and was never compensated for his actual time worked, his facts are more akin (although far more egregious) to those present in *Armour*.

Analyzing the *Armour/Skidmore* opinions, the Fifth Circuit in *Bright v. Houston Northwest Medical Center Survivor, Inc.*, 924 F.2d 671, 676 (5th Cir. 1991), found dispositive the facts that:

> . . . Bright did not have to remain on or about his employer's place of business [DePriest did], or some location designated by his employer, but was free to be at his home or at any place or places he chose [DePriest was not], without advising his employer [DePriest testified he would be in trouble if he left the hospital], subject only to the restrictions that he be reachable by beeper [DePriest was not even provided a beeper by the defendant], not be intoxicated, and be able to arrive at the hospital in 'approximately' twenty minutes. . . Bright **was not only able to carry on his normal personal activities at his own home, but could also do normal shopping, eating at restaurants, and the like, as he chose**.
>                                         (Emphasis added)

"The critical issue. . . is whether the employee can use the time effectively for his or her own purposes." *Bright*, at 676. In this case, the evidence shows and establishes that Mr. DePriest could

not, in any way, use the time between 11 p.m. and 7 a.m. "effectively for his own purposes." Indeed, it was a rare night indeed when he was not awoken several times during the night to retrieve a patient and perform a radiologic procedure. He could not leave the hospital and his only mechanism to receive the call was to stay by the phone in the ultrasound room. He was provided with no beeper. Mr. DePriest's situation is further exacerbated by the fact that he was required to report every Friday at 11 p.m. Every Saturday morning, he had to be awake by 7 a.m., work 16 hours until 11 p.m., receive calls until 7 a.m. Sunday morning, and work another 16 hours until 11 p.m. on Sunday night. Although he did sleep some during the 11 p.m. to 7 a.m. period, it is hard to imagine under the facts presented that he had any time to pursue personal endeavors. "As noted, we have described 'the critical issue' in cases of this kind as being 'whether the employee can use the [on-call] time effectively for his or her own purposes.' This does not imply that the employee must have substantially the same flexibility or freedom as he would if not on call. . ." *Bright*, at 677, citations omitted.

Indeed, there is no evidence that Mr. DePriest could "play ping-pong", "play pool", "entertain visitors", work out in a gym, was provided free meals or cooking facilities, was even provided a proper bed, was provided "recreational facilities", was provided "leisure activities". Mr. DePriest was not free to even go get fast food down the street, let alone, a real bed, a gym, or any recreational facilities. As he was provided no beeper or cell phone by River West, he was tied to the ultrasound room telephone. He was not free to leave.

## CONCLUSION:

Genuine issues of material fact preclude the grant of summary judgment herein. This case presents essentially two claims: 1) under La. R.S. 23:631 for unpaid wages at $22.87 for 452.5 hours

19

(less any sums actually received); 2) under the FLSA for unpaid overtime compensation at $34.31 for 207.25 hours (less any sums actually received). Defendant essentially does not challenge Mr. DePriest's entitlement to his unpaid wages under Louisiana law because it offers no explanation of the obvious mandate contained in the statute and absence of any "exception" to the rule of payment. As to defendant's argument that Mr. DePriest's time was non-compensable "sleeping time", the evidence offered shows that Mr. DePriest rarely, if ever, had uninterrupted sleep on any of the weekends he worked. He was required to arrive at the hospital at 11 p.m. - not to "clock in" - but to be there for the emergencies that came in. He was provided no beeper or cell phone by the defendant and was held hostage to the telephone in the ultrasound room. He was not even afforded access to a shower. He brought his own food and drinks in a cooler and had no "cooking facilities".

Substantially, he did the identical work between the hours of 11 p.m. - 7 a.m. as he did during the hours of 7 a.m. - 11 p.m. He had no opportunity to use the disputed time for any "personal pursuits."

It is finally noted that defendant's attempts to rewrite history, particularly in the Arbour Affidavit, directly contrary to Arbour's sworn testimony, merely serves to highlight the disputed nature of the facts. Summary judgment should be denied entirely.

Respectfully submitted,

By: _____
Jill L. Craft, T.A., #20922
8702 Jefferson Highway, Suite B
Baton Rouge, Louisiana 70809
(225) 928-5353

20

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that I have served a copy of the above and foregoing upon trial counsel of record for all parties hereto via First Class United States mail, properly addressed with sufficient postage affixed thereto on this _____ day of November, 2004.

Baton Rouge, Louisiana, this _____ day of November, 2004.

_____